******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

McDONALD, J., with whom PALMER, J., joins, concurring in part and dissenting in part. The majority's resolution of this case yields the detritus of a needless collision between two competing statutory mandates. On the one hand, the legislature has adopted an evidentiary privilege to foster and protect the free flow of confidential information between a patient and her psychiatrist in a therapeutic setting. On the other hand, the legislature has endorsed a broad presumption that all records in the possession of a governmental agency are public records, unless delimited by an applicable, specific, and narrow exception. Rather than charting a path that balances and accommodates both of these statutory priorities, the majority construes one to vanquish the other and, in the process, deviates significantly from critical principles at the core of open government. In my opinion, it is unnecessary to do so.

The records at issue in this appeal and cross appeal concern Amy Archer Gilligan, a notorious serial killer who was perhaps America's deadliest murderess. M. Phelps, The Devil's Rooming House: The True Story of America's Deadliest Female Serial Killer (2010). Historians and others have been focused on her case for decades. Her crimes have inspired several books, articles, plays, and even a major motion picture. Authors remain drawn to the facts and circumstances of her crimes to this day. The complainant in the present case, author Ron Robillard, seeks records from the plaintiff Department of Mental Health and Addiction Services (department) relating to Gilligan's thirty-eight year involuntary commitment at the Connecticut State Hospital, now Connecticut Valley Hospital (hospital) following her conviction for murder in the second degree. Robillard seeks the information to shed light on how this state historically has handled its mentally ill convicts.

The circumstances presented in this case are fairly characterized as unique. I recognize that one might ordinarily expect that records held by mental health treatment facilities would, as a general matter, not be subject to public records requests. But, because the documents at issue here were created and are held by a public institution where Gilligan was committed after her conviction, they are subject to the Freedom of Information Act (act), General Statutes § 1-200 et seq. Because that act creates a presumption that all records at public institutions shall be open to the public, an agency seeking to shield records from the public eye in the face of a records request must identify a statutory exemption which permits them to be withheld. Under the act's exemptions, the legislature has created numerous privi-

leges and protections that intersect and, in some cases, overlap to address privacy concerns that the legislature has deemed worthy of protection.

In the present case, the defendant Freedom of Information Commission (commission) ordered the release of some of Gilligan's records, but the department maintains that they are exempt from release under two exemptions to the act: (1) the exemption in General Statutes § 1-210 (b) (10) for records protected by the psychiatrist-patient privilege set forth in General Statutes § 52-146e; and (2) the exemption in § 1-210 (b) (2) for personnel, medical, and similar files the release of which would constitute an invasion of personal privacy. Our role is not to revise or expand these statutory exemptions, but to apply faithfully their requirements to the documents before us in light of the long-standing principles governing our application of the act and its exemptions.

The act mandates that all government records shall be open to the public for its review, subject to certain, limited exemptions. We have acknowledged, repeatedly and forcefully, that the legislative policy embodied in the act represents this state's abiding commitment to "the open conduct of government and free public access to government records." *Wilson* v. *Freedom of Information Commission*, 181 Conn. 324, 328, 435 A.2d 353 (1980); *Perkins* v. *Freedom of Information Commission*, 228 Conn. 158, 166, 635 A.2d 783 (1993) (same); *Board of Education* v. *Freedom of Information Commission*, 208 Conn. 442, 450, 545 A.2d 1064 (1988) (same). "We consistently have held that this policy requires us to construe the provisions of the [act] to favor disclosure and to read narrowly that act's exceptions to disclosure. See, e.g., *Gifford* v. *Freedom of Information Commission*, 227 Conn. 641, 651, 631 A.2d 252 (1993); *Superintendent of Police* v. *Freedom of Information Commission*, 222 Conn. 621, 626, 609 A.2d 998 (1992)." *Waterbury Teachers Assn.* v. *Freedom of Information Commission*, 240 Conn. 835, 840, 694 A.2d 1241 (1997).

The drafters of the act recognized that the presumption in favor of disclosure of public records would not serve to preordain that result in every instance. Rather, as Representative Martin B. Burke, who sponsored the bill in the House of Representatives, acknowledged, the presumption that records of public agencies would be open would have to yield "in those instances where superior public interest requires confidentiality." (Internal quotation marks omitted.) 18 H.R. Proc., Pt. 8, 1975 Sess., p. 3911. Since shortly after the act was adopted in 1975; Public Acts 1975, No. 75-342; this court has undertaken to effectuate the legislature's "intention to balance the public's right to know what its agencies are doing, with the governmental and private needs for confidentiality." *Wilson* v. *Freedom of Information*

*Commission*, supra, 181 Conn. 328. Indeed, that balancing effort must govern our interpretation and application of the act in circumstances such as those presented in the present case. Id., 328–29. In doing so, we presume that the records should be disclosed, we construe any exception to disclosure narrowly, and we place the burden of proving the applicability of that narrowly construed exception upon the agency advocating it. Id., 329.

This principle of restraint applies equally to the psychiatrist-patient privilege, which the legislature has identified as an exception to the act. Although the privilege provides protection for those records that fall within its scope, we must exercise great caution before granting that protection. With respect to the psychiatric-patient privilege, we have explained that "[a]s with any claim of privilege, a statutory privilege has the effect of withholding relevant information . . . . Accordingly, although a statutory privilege must be applied so as to effectuate its purpose, it is to be applied cautiously and with circumspection because it impedes the truth-seeking function . . . . [T]he purpose of the psychiatrist-patient privilege is to safeguard confidential communications or records of a patient seeking diagnosis and treatment . . . so as to protect [the] therapeutic relationship. . . . It therefore is axiomatic that [c]ommunications that bear no relationship to the purpose for which the privilege was enacted do not obtain shelter under the statute . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Montgomery*, 254 Conn. 694, 724, 759 A.2d 995 (2000)

Proper application of the principles underlying the act and its exemptions convinces me that some, but not all, of the documents at issue fall within the exceptions raised, and, therefore, should be redacted or withheld. I am also persuaded that some of the documents clearly are not exempt from release. My in camera review of these records leaves me concerned, however, about a third category of documents: those that contain medical information, including records of physical and dental examinations. The commission concluded that medical and dental records are not psychiatric in nature and therefore are subject to release. The department urges us to conclude, however, that medical and dental records are covered by the psychiatric-patient privilege as a matter of law because it is possible that they could relate to a patient's psychiatric care. In my view, the law is more nuanced than the department allows. It is possible, but unclear from the face of the documents, that the medical and dental records may relate to Gilligan's psychiatric treatment. I would, therefore, make clear that medical and dental records may properly be covered by the psychiatric-patient privilege if there is some evidence, either in the content of the document or through extrinsic evidence, that they in fact related to a patient's psychiatric care. Consequently, I would

reverse, in part, the commission's decision that all of the documents at issue must be released and remand the matter for further consideration of the medical and dental records.

The majority takes a different juristic approach, one that does not resemble a careful application of the psychiatric-patient privilege, and one that does not acknowledge the competing legislative priorities embodied in the act that we are compelled to balance. Rather than looking to the contents of the documents to determine whether they meet the statutory requirements for applying the privilege, the majority recasts them all as medical and dental records and then broadly concludes that all such records created at an inpatient treatment facility are, as a matter of law, psychiatric records. This heavy-handed approach does not recognize that many of the documents are not medical and dental records at all, but are merely administrative records and correspondence having nothing to do with Gilligan's psychiatric treatment. Moreover, the privilege does not protect every document that finds its way into an inpatient's file, nor does it protect every communication made at a treatment facility. Instead, it applies—by the statute's express terms—only to "communications and records thereof *relating to diagnosis or treatment of a patient's mental condition . . . .*" (Emphasis added.) General Statutes § 52-146d (2). The contents of the communications and records dictate whether they are privileged, not the fact that the communications and records happen to reside in a particular patient file. Nevertheless, the majority decides that each and every one of the documents at issue—whether psychiatric, medical, dental, administrative, or otherwise—must be shielded from the public, basing its decision primarily on *where* the documents were created, with almost no regard for their content. Because I cannot join the majority's analytic framework that revises the reach of the psychiatric-patient privilege beyond the plain language of its enabling statute, I concur in part and dissent in part.

I

PSYCHIATRIC COMMUNICATIONS PRIVILEGE

The psychiatrist-patient privilege is entirely a creature of statute. See General Statutes § 52-146e. Therefore, in order to find protection under the privilege, the communications or records at issue must meet the strict requirements set out in § 52-146d. See, e.g., *Bieluch* v. *Bieluch*, 190 Conn. 813, 819, 462 A.2d 1060 (1983). The psychiatrist-patient privilege extends protection only to "communications and records thereof relating to diagnosis or treatment of a patient's mental condition . . . ." General Statutes § 52-146d (2). Furthermore, the communications must be made by and between the patient, her family, her psychiatrist, or someone participating under the supervision of a psychiatrist. General

Statutes § 52-146d (2). The statute places no restrictions on where the communications may be made. Because, however, the privilege was created for the limited purpose of protecting the therapeutic relationship between the patient and the psychiatrist, records that are not of communications between protected parties or that do not relate to the diagnosis or treatment of a patient's mental condition do not receive protection under the privilege, even if prepared by or under the direction of a psychiatrist. See *Bieluch* v. *Bieluch*, supra, 818–19 (psychiatrist's evaluation of children undertaken to advise parent in custody dispute was not privileged because children were not being treated by psychiatrist); see also *State* v. *Montgomery*, supra, 254 Conn. 725 (communication between patient and acquaintance not protected, even though made at inpatient psychiatric facility and in presence of someone acting under psychiatrist's direction).

The department, as the proponent of the privilege in the present case, has the burden of proving that the privilege applies. *New Haven* v. *Freedom of Information Commission*, 205 Conn. 767, 777, 535 A.2d 1297 (1988). If the documents themselves demonstrate that the privilege applies, a proponent can meet this burden simply by offering the documents for in camera inspection by the commission's hearing officer (or the court, as the case may require). See, e.g., *Lash* v. *Freedom of Information Commission*, 300 Conn. 511, 517–20, 14 A.3d 998 (2011) (in camera review of exhibits at issue established that exhibits were, on their face, privileged, eliminating need for extrinsic evidence). If the documents, standing alone, do not demonstrate that they are privileged, however, the proponent can present testimony from a holder of the records to establish the necessary factual predicate. See, e.g., *State* v. *Jenkins*, 73 Conn. App. 150, 162, 807 A.2d 485 (2002) (director of mental health services testified that nursing assessment was made under supervision of psychiatrist and was for purpose of gathering information needed to treat patient's mental condition), rev'd in part on other grounds, 271 Conn. 165, 169, 856 A.2d 383 (2004). Either way, the proponent of the privilege must "provide more than conclusory language, generalized allegations or mere arguments of counsel. Rather, a sufficiently detailed record must reflect the reasons why an exemption applies to the materials requested." (Internal quotation marks omitted.) *Lash* v. *Freedom of Information Commission*, supra, 517–18; see also *Bieluch* v. *Bieluch*, supra, 190 Conn. 819 (psychiatric privilege does not apply if proponent fails to establish necessary evidentiary foundation that records relate to diagnosis and treatment of mental condition).

Applying these governing principles to the documents at issue, I am persuaded that they fall generally into three categories: those that plainly fall within the requirements for applying the privilege; those that

plainly fall outside the privilege; and those records relating to Gilligan's medical and dental care that may be privileged and should be reconsidered by the commission. I will address each category in turn.

### A

As for the first category, some of the documents patently fall within the privilege, and I agree with the majority that they must be withheld or redacted. Based on my own in camera review of this subset of the documents, it is readily apparent that they relate to the diagnosis and treatment of Gilligan's mental condition. They contain, for example, descriptions of Gilligan's psychiatric diagnosis. This information properly falls within the privilege and should be exempted from release. The trial court's judgment should be reversed in part and the matter remanded to the commission so that it may order these documents withheld or redacted as necessary to protect privileged information.

### B

As for the second category of documents, these plainly fall outside the privilege. For one thing, a number of these documents have nothing to do with the "diagnosis or treatment of a patient's mental condition . . . ." General Statutes § 52-146d (2). One example is a "visit or discharge" form stating the basis for Gilligan's discharge from the hospital (it is a matter of public record that she died at the hospital). Another example is a letter from the superintendent of the hospital to Gilligan's daughter acknowledging receipt of an item that she had sent to her mother. None of these documents contain any information bearing on the diagnosis or treatment of Gilligan's mental condition. Additionally, the department's own witness testified at a hearing before the commission that certain documents were *not* psychiatric records, including the correspondence with Gilligan's daughter. Without any evidence relating these documents to Gilligan's psychiatric diagnosis or treatment, the department did not provide a factual predicate to support a finding that they are exempt from disclosure, and the majority is incorrect in concluding that they are exempt.

In addition, one of the documents reflects communications with a person who is not covered under the ambit of the statute. The privilege protects only those communications that are made between a patient, her family, her psychiatrist, or one acting under her psychiatrist's supervision. General Statutes § 52-146d (2); see also *State* v. *Montgomery*, supra, 254 Conn. 724. One of the documents is a letter addressed to a representative of a life insurance company, and there is no evidence in the record that the representative was a family member of Gilligan's or that he was a psychiatrist or was working under a psychiatrist's supervision. The department has already released other items of corre-

spondence with the insurance company that demonstrate that the purpose of the correspondence related to the payment of dividends from a life insurance policy. The only distinguishing aspect of the letter the department withheld is that it mentions Gilligan's psychiatric diagnosis in response to the insurance company's inquiry about whether Gilligan could transact business relating to the dividends. But, because the letter is a communication to a third party who is not covered under the reach of the statute, it cannot fall within the privilege. *State* v. *Montgomery*, supra, 724. The trial court's judgment affirming the commission's decision to permit the release of these documents should be affirmed.

C

The third category of documents, which pertains to Gilligan's medical and dental care, presents a more difficult question. The commission, after reviewing these documents in camera, determined that nothing in them related to Gilligan's psychiatric care and ordered them to be released. On appeal, the department asks this court to interpret the psychiatric-patient privilege to protect all of Gilligan's medical and dental records as a matter of law. The commission, however, maintains its position that nothing in Gilligan's medical and dental records establishes a relationship to her psychiatric care, and, thus, they cannot be privileged. The majority adopts the department's interpretation and holds that all medical and dental records created at an inpatient psychiatric facility are, as a matter of law, privileged psychiatric records. I disagree and would instead clarify that medical and dental records *may* fall within the privilege, but only if there is some evidence, either in the documents or otherwise, to show that they relate to a patient's psychiatric care. I would reverse that portion of the trial court's judgment ordering disclosure of certain of the medical records and would order that court to remand the matter to the commission for it to reconsider the privileged status of these documents in light of this clarification.

Unlike the majority, I cannot accept the department's expansive interpretation of the psychiatric privilege. Section 52-146d (2) expressly requires that records must relate to the diagnosis and treatment of a patient's mental condition. If the medical and dental records requested do not relate to a patient's psychiatric care, then they cannot receive protection under § 52-146e, even though they were created at an inpatient psychiatric facility. Id. Nevertheless, the department's claim of privilege does not rest on the content of the documents, as it should, but, instead, on the location where they were created. The department asserts that all of the documents are privileged simply because they were created at an inpatient mental health facility, irrespective of whether they actually related to Gilligan's psychi-

atric treatment.

The department's interpretation favoring inpatient records has no basis in the statutory text. Section 52-146e (a) applies equally to all records regardless of where they were created. It makes no distinction between records created at inpatient facilities from those created at outpatient facilities, nor does it provide any distinct or greater protection to inpatient records. Its requirements apply equally to records and communications "wherever made"; General Statutes § 52-146d (2); including those records and communications made at " 'mental health facilit[ies]' " that provide either "inpatient or outpatient service[s] . . . ." General Statutes § 52-146d (5).

The department argues that records of physical and dental examinations relate to psychiatric treatment because psychiatric illnesses *sometimes* involve physical symptoms and vice versa. This may be true, but this hypothetical possibility, standing on its own, does not justify an interpretation that all inpatient records relate to a patient's psychiatric care as a matter of law. To be sure, an inpatient facility treating a person for mental illness will certainly produce many records pertaining to the patient, and many of those records will relate to the patient's psychiatric care. But other records having nothing to do with the patient's psychiatric care will also become part of the patient's file for no other reason than that the patient happens to reside at the facility. A person involuntarily committed to an inpatient psychiatric facility is not free to leave the facility, and so becomes dependent on the facility for far more than just psychiatric care. Simply because a psychiatric inpatient might see a physician for a cholesterol screening or a dentist for a semiannual teeth cleaning does not, itself, establish that the patient's health and dental cleaning records relate to a mental condition.

In support of its interpretation, the department cites to General Statutes § 17a-545, a provision that requires an inpatient psychiatric facility to conduct annual physical examinations of its patients, and argues that this demonstrates the legislature's acknowledgment that physical conditions relate to psychiatric conditions. I disagree. This provision is nothing more than an unremarkable recognition that someone hospitalized for psychiatric illness is also dependent on the institution for care of any physical condition, even if it is unrelated to the patient's psychiatric treatment. Consequently, § 17a-545 ensures that each patient receives at least an annual checkup. And contrary to the department's interpretation equating purely medical records with psychiatric records, the privilege statutes explicitly differentiate between treatment for physical and mental conditions. For example, the physician-patient privilege—which the department has not asserted—expressly extends its protections to communications

relating to either "*physical* or *mental*" conditions. (Emphasis added.) General Statutes § 52-146o (a) (1). Significantly, the psychiatric privilege omits any mention of records relating to a patient's *physical* condition, thus contradicting any conclusion that the legislature intended the phrase "mental condition" to include both physical and mental conditions. See *State* v. *B.B.*, 300 Conn. 748, 759, 17 A.3d 30 (2011) ("[w]here a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed" [internal quotation marks omitted]). The legislature could easily have crafted the psychiatric privilege to include a similarly broad protection to cover records concerning a patient's *physical* condition, but it did not.

Rather than expanding the reach of the statute to favor records created in one place over those created in another, I would instead clarify that, just as with any other type of communication or record, medical and dental records may indeed fall within the privilege, but only if there is some evidence, either in the documents or otherwise, to show that they relate to a patient's psychiatric care. If the contents of the documents do not establish the required relationship, then the proponent of the privilege can present testimony or other extrinsic evidence to demonstrate that records otherwise appearing to be purely medical and dental in nature nevertheless relate to the patient's psychiatric care. For example, in *State* v. *Jenkins*, supra, 73 Conn. App. 162, the Appellate Court held that a record labeled "nursing assessment" that contained biographical data qualified as a psychiatric record because a psychiatrist from the treating facility specifically testified that all of the information in the assessment was used to "gather information about mental health issues . . . ." (Citation omitted; internal quotation marks omitted.) *Jenkins* demonstrates that supporting testimony need not be extensive, nor must it divulge the contents of the records. See id. The proponent must nevertheless present *some* evidence to show that a document meets the statutory requirements. *Lash* v. *Freedom of Information Commission*, supra, 300 Conn. 517–18. In light of this clarification, I would remand the matter back to the commission for further consideration of Gilligan's medical and dental records under this standard. This would permit the commission to consider extrinsic evidence and determine whether, in light of that evidence, any of the remaining documents should be redacted or withheld under the psychiatric privilege or any other privilege that the department may properly raise.[1]

D

There is one additional point I must address with respect to the psychiatric privilege. As a fallback position, the department argues and the majority agrees

that § 52-146e prohibits the release of any document that would identify the subject of the record as a psychiatric patient. It contends that the release of *any* of Gilligan's records would therefore violate the privilege. I disagree, however, because this interpretation is at odds with § 52-146e.

In the context of the act's exemptions, the psychiatric-patient privilege statute; General Statues § 52-146e; does indeed prohibit the release of records that identify a patient, but only if they meet the statutory definition of communications and records as defined in § 52-146d (2). Section 52-146e (a) prohibits any person from disclosing "*communications and records* or the substance or any part or any resume thereof *which identify a patient* . . . ." (Emphasis added.) As I have already discussed at length, "communications and records" are defined as those made between certain parties that pertain to a patient's psychiatric care. General Statutes § 52-146d (2). If a record does not fall within this definition, § 52-146e (a) does not prohibit the disclosure of the record or its substance.

For example, in *State* v. *Montgomery*, supra, 254 Conn. 723, a mental health assistant (assistant) was permitted to testify about patient conversations that she overheard even though her testimony identified the defendant as a psychiatric inpatient. The defendant in that case had committed a murder and, before he could be identified by police as the murderer, he checked himself into a psychiatric hospital, apparently because he was suicidal. Id., 711 and n.27. The hospital placed him under the watch of an assistant, who constantly monitored his activities. Id., 722–23. While at the hospital, the defendant called an acquaintance and the assistant overheard the defendant telling the acquaintance to provide him with an alibi for the time of the murder. Id., 723. The assistant was allowed to testify before the court, initially outside the presence of the jury, that the defendant was treated at the psychiatric hospital where she worked; that a psychiatrist had instructed her to monitor the defendant on a " 'one-to-one' " basis and to take notes of his activities every fifteen minutes; and that such protocol was typical for suicidal patients. Id., 722–23. She also testified about the substance of the defendant's telephone call. The trial court allowed her testimony and she repeated much of this same information to the jury. See *State* v. *Montgomery*, Conn. Supreme Court Records & Briefs, January Term, 2000, Defendant's Appendix p. A-15 (in its closing argument, state explained that defendant was checked into psychiatric hospital and reminded jury of testimony given by assistant that she had to remain within arm's reach of defendant and that she overheard certain telephone conversation). Following his conviction for murder, the defendant appealed to this court and claimed that the assistant's testimony violated the psychiatric-patient privilege. *State* v. *Montgomery*, supra, 723. This court

upheld the admission of the testimony because the communications revealed by the assistant's testimony did not meet the definition of protected communications and records. Id., 725. Specifically, we concluded that the communications did not relate to the defendant's diagnosis and treatment and, in addition, were not made to a party covered by the statute. Id. The department's interpretation of communications and records in the present case, however, would have precluded the assistant's testimony in its entirety in *Montgomery* because it identified the defendant as a psychiatric patient, thus rendering our holding in *Montgomery* invalid.

In support of its interpretation, the department cites *Falco* v. *Institute of Living*, 254 Conn. 321, 757 A.2d 571 (2000). In *Falco*, the plaintiff, a patient at the Institute of Living (Institute), a psychiatric facility, wanted to bring an action against a patient who had assaulted him at the Institute, but he did not know the other patient's identity. Id., 323–24. The plaintiff sent a bill of discovery to the Institute demanding that it produce the other patient's name, but it refused. Id. On appeal, this court upheld the Institute's denial because if it had provided the individual's name it would impermissibly reveal the otherwise *confidential* fact that the individual was being treated for a psychiatric condition. Id., 328–29. Although § 52-146e (a) extends the privilege to only those "communications and records" that identify a patient, this court did not look to whether the information sought actually fit within the statutory definition of protected communications and records. Id., 326–29. Instead, our decision was driven in large measure by the policy notion that a central purpose of the statute is to protect the confidentiality of a patient's identity, as well as the confidentiality of a patient's communications and records. We explained that "[t]he confidentiality of a patient's identity is as essential to the statutory purpose of preserving the therapeutic relationship as the confidentiality of any other information in a patient's communications and records." Id., 329. Thus, the central consideration supporting our decision in *Falco* was that revealing the individual's name would release otherwise confidential identifying information, which could damage the therapeutic relationship. Id.

*Falco* does not apply to the present case, however, because there is no confidential patient identity to be protected. Gilligan's commitment to the hospital and her status as a psychiatric patient has been and remains a matter of official public record because Gilligan was committed to that facility for psychiatric care by order of public authorities following her conviction for murder in the second degree. After her conviction, she was sent to Connecticut State Prison in Wethersfield, but was later "reported to the [g]overnor as insane" and the governor ordered her to be transferred to the hospital "until she shall have recovered her sanity . . . ." The department has also previously released other

records, including letters to prison officials and a life insurance company, stating plainly that Gilligan was a patient at the hospital. One such letter on hospital letterhead states that Gilligan "is still a patient in this hospital and is enjoying quite comfortable health, physically, although mentally shows practically no change." That Gilligan was a patient at the hospital is indisputably not a confidential fact, so the policy concerns that drove our decision in *Falco* are not implicated here. See *Bieluch* v. *Bieluch*, supra, 190 Conn. 819 ("[c]ommunications that bear no relationship to the purpose for which the privilege was enacted do not obtain shelter under the statute and are admissible subject to the normal rules of evidence"). Consequently, I would not extend *Falco* beyond its foundation to cover the nonconfidential information at issue in the present case.

Finally, the department also cites our prior observations that the psychiatric-patient privilege provides broad protections from disclosure for psychiatric records, but these observations do not justify expanding the reach of the statute beyond its text. Communications do not merit protections unless they fall within the statute's scope, which we are powerless to expand. Moreover, the competing considerations at stake require us to apply the privilege "cautiously and with circumspection . . . ." (Internal quotation marks omitted.) *State* v. *Montgomery*, supra, 254 Conn. 724. Similarly, our freedom of information jurisprudence requires that we interpret its exemptions narrowly in light of the "overarching policy underlying the [act] favoring the disclosure of public records." (Internal quotation marks omitted.) *Director, Retirement & Benefits Services Division* v. *Freedom of Information Commission*, 256 Conn. 764, 772–73, 775 A.2d 981 (2001). Any tension between the legislative policy behind the protections of the psychiatric-patient privilege and the act does not permit us to vitiate one policy in favor of the other; rather, it requires that we faithfully adhere to the limits prescribed in §§ 52-146d and 52-146e (a). For these reasons, I cannot accept the department's and the majority's overbroad interpretation of the privilege.

II

PERSONAL PRIVACY EXEMPTION

My conclusion in part I leaves for consideration the question of whether the documents must be withheld under the second claimed exemption at issue, the invasion of personal privacy exemption in § 1-210 (b) (2). As an alternative to its psychiatric-patient privilege claim, the department also asserts that all of the documents at issue are exempt from disclosure under § 1-210 (b) (2), which exempts from release any "[p]ersonnel or medical files and similar files the disclosure of which would constitute an invasion of personal privacy . . . ." The parties do not dispute that the documents

at issue are the type of personnel, medical, or similar files protected by the exemption; the only question remaining is whether the release of those records would constitute an invasion of personal privacy. Because the majority does not reach this question, I address it only briefly and conclude that this exemption does not protect the documents.[2]

A

As a threshold matter, the commission asserts that the exemption in § 1-210 (b) (2) does not protect the privacy interests of individuals who are deceased. I agree.

To determine the scope of the privacy interest protected by this exemption, we historically have looked to the invasion of privacy tort in § 652D of the Restatement (Second) of Torts. 3 Restatement (Second), Torts § 652D (1977). In *Perkins* v. *Freedom of Information Commission*, supra, 228 Conn. 175, this court explored in detail the contours of the personal privacy exemption in § 1-210 (b) (2), formerly General Statutes § 1-19. We explained that the phrase used by the legislature in that exemption, "invasion of personal privacy," had acquired a peculiar meaning within the law and must therefore be construed consistently with that meaning. Id., 169; see also General Statutes § 1-1 (a) (requiring us to construe statutory references to legal terms of art consistently with their legal meaning). This court determined that the invasion of personal privacy exemption found "its most persuasive common-law counterpart in the tort of invasion of privacy . . . that provides a remedy for unreasonable publicity given to a person's private life"; (footnote omitted) *Perkins* v. *Freedom of Information Commission*, supra, 171; and that the relationship between the exemption and the common-law tort was "close and compelling." Id., 173. In light of this close relationship, we used the standards for unreasonable publicity in § 652D of the Restatement (Second) to define the scope of the exemption. Id., 171–73. I therefore turn to the Restatement (Second) for guidance.

The Restatement (Second) provides that an action for invasion of personal privacy is personal to the individual, and thus can only be maintained by a living person. Section 652I of the Restatement (Second) of Torts provides in relevant part that "an action for invasion of privacy can be maintained only by a living individual whose privacy is invaded." The commentary further explains that "[t]he right protected by the action for invasion of privacy is a personal right, peculiar to the individual whose privacy is invaded"; id., comment (a), p. 403; and, as such, "[i]n the absence of statute, the action for the invasion of privacy cannot be maintained after the death of the individual . . . ." Id., comment (b), p. 403. This principle is consistent with our law of torts and we have no statute that reverses the common-law rule that actions for personal torts do not survive

a plaintiff's death. Although we have a statute that permits a personal representative to maintain some types of actions after death; General Statutes § 52-599; actions for personal torts cannot be assigned and extinguish upon the death of the plaintiff. See, e.g., *Gurski* v. *Rosenblum & Filan, LLC*, 276 Conn. 257, 267, 885 A.2d 163 (2005); *Dodd* v. *Middlesex Mutual Assurance Co.*, 242 Conn. 375, 382–83, 698 A.2d 859 (1997).

Applying the principles of the Restatement (Second) to the present case, the personal privacy exemption does not protect the documents at issue. The parties agree that the subject of the records, Gilligan, died more than fifty years ago, in 1962. Even if one were to assume that the exemption extends to the privacy interests of family members, there is no suggestion, assertion or proof of any surviving family members—Gilligan had only one child, who died in 1968. Because it is undisputed that Gilligan is deceased, and there is no evidence in the record that another living person is at risk of having his or her privacy invaded by a release of the documents at issue, this exemption should not apply.

## B

Assuming for the sake of argument that the exemption could protect some privacy interests of a decedent, I am still persuaded that release of the documents at issue would not constitute an invasion of privacy within the meaning of the exemption.

In *Perkins*, we adopted a two part test for determining whether release of records would invade an individual's privacy. After examining the standard and accompanying commentary of § 652D of the Restatement (Second) of Torts for the tort of invasion of privacy, the court in *Perkins* concluded that the exemption "precludes disclosure . . . only when [1] the information sought by a request does not pertain to legitimate matters of public concern and [2] is highly offensive to a reasonable person." *Perkins* v. *Freedom of Information Commission*, supra, 228 Conn. 175. The department has not shown that either element applies here.

Turning to the first part of the test, I am persuaded that the department has not met its burden to show a lack of a legitimate public interest. The commission found, as a matter of fact, that legitimate public interest remains concerning Gilligan, her crimes, and her nearly four decade confinement at the hospital. The record supports this finding. The complainant filed an uncontroverted statement with the commission explaining that, apart from the notoriety Gilligan's case received from movies and plays, there remains interest in her crimes, her illness and her treatment. The State Library has recognized the historical significance of her case and has retained a robust file about her criminal proceedings, including charging documents, trial transcripts, and appellate briefs.[3] Authors have continued

to publish books and newspaper articles about her. See, e.g., M. Phelps, supra; M. Bovsun, "True Crime Story Behind Classic Comedy 'Arsenic & Old Lace,'" N.Y. Daily News, January 16, 2010, available at http://www.nydailynews.com/news/crime/true-crime-story-behind-classic-comedy-arsenic-old-lace-article-1.462904 (last visited September 2, 2015); B. Ryan, "Whatever Went Wrong With Amy?," N.Y. Times, March 2, 1997, p. CN1. The records sought in the present case pertain to Gilligan's commitment at the hospital and provide significant information about how the state historically has treated its mentally ill criminals. Even though a substantial amount of time has passed since Gilligan's crimes in the early 1900s and her death in 1962, that does not alone eliminate the legitimacy of the public's interest, especially in light of the continued attention her case has received from historians and authors. See 3 Restatement (Second), supra, § 652D, comment (k), p. 393 ("[p]ast events and activities may still be of legitimate interest to the public, and a narrative reviving recollection of what has happened even many years ago may be both interesting and valuable for purposes of information and education"). Nor does Gilligan's status as an involuntary public figure defeat a finding of a legitimate public interest concerning otherwise private affairs. See id., comment (f), p. 389 ("[t]hose who commit crime or are accused of it may not only not seek publicity but may make every possible effort to avoid it, but they are nevertheless persons of public interest, concerning whom the public is entitled to be informed"). The commission's finding of an enduring and legitimate public interest in the case of a notorious serial killer and the state's confinement of, and care for, her after her conviction is reasonable and not contrary to law, and, therefore, must be sustained. See *Perkins* v. *Freedom of Information Commission*, supra, 228 Conn. 164–65 ("[t]he court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion" [emphasis omitted; internal quotation marks omitted]).

Moreover, the department has not proven that the release of Gilligan's records would be highly offensive to a reasonable person. Gilligan is long deceased. Even assuming, arguendo, that death does not extinguish the decedent's privacy rights, it certainly must diminish them. And when, as here, the records pertain to a public figure, it is permissible to publicize otherwise private matters that one could not publicize about a nonpublic figure. See 3 Restatement (Second), supra, § 652D, comment (h), p. 391 ("the life history of one accused of murder, together with such heretofore private facts as may throw some light upon what kind of person he is, his possible guilt or innocence, or his reasons for committing the crime, are a matter of legitimate public interest"). We note that the federal Health Insurance

Portability and Accountability Act (HIPAA), 42 U.S.C. § 1320d et seq., provides objective evidence that community standards disfavor the release of medical records, but we also note that HIPAA restricts the release of such information for only fifty years after an individual's death. 45 C.F.R. § 164.502 (f). Gilligan has been deceased for more than fifty years. Finally, even if the department had shown that release of Gilligan's medical and dental records would be highly offensive, many of the remaining records are merely administrative records similar to others concerning Gilligan that the department has already released. I am persuaded, therefore, that this exemption does not apply to the documents at issue.

Accordingly, I concur in part and dissent in part.

[1] As previously mentioned, the department did not raise the physician-patient privilege in these proceedings, which one would logically assume might be relevant to Gilligan's medical records. Although it is not entirely clear from the record, it appears that the department did not raise the physician-patient privilege because it was not made applicable to requests under the act until after the start of the proceedings at issue here. Public Acts 2011, No. 11-242, § 37; see General Statutes § 1-210 (b) (10). It now appears that, since the legislature adopted this change, the commission has applied the privilege to withhold medical records falling within its scope, including records of physical examinations. See *Maurer* v. *Office of Corporation Counsel*, Freedom of Information Commission, Docket No. FIC 2011-370 (June 13, 2012). Consequently, in light of this development, I would permit the department on remand to raise this and any other potentially applicable privilege to the extent allowed by law.

[2] I agree with the majority's conclusion in part I of its opinion that the department, as the holder of the records at issue, has standing to assert this exemption. See *State Library* v. *Freedom of Information Commission*, 240 Conn. 824, 834, 694 A.2d 1235 (1997) (agency subject to commission's order is aggrieved because noncompliance could result in civil and criminal penalties). I note, however, that I do not understand why the majority has analyzed the department's standing in its opinion. The standing issue raised by the commission pertains only to the department's standing to raise the personal privacy exemption, which the majority does not address. The majority addresses only the psychiatric records privilege, which the commission concedes that the department has standing to raise. Nevertheless, I agree with the majority's conclusion that the department has standing to raise this exemption.

[3] Perhaps recognizing their historical significance, the department has kept the records at issue even though Gilligan died more than fifty years ago and no law requires their retention.